Claire Loebs Davis, WSBA #39812
Keith Cohon, WSBA #15103
ANIMAL & EARTH ADVOCATES, PLLC
2226 Eastlake Ave E #101
Seattle, WA 98102
Tel: (206) 601-8476
claire@animalearthadvocates.com
keith@animalearthadvocates.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE LANDS COUNCIL, WESTERN WATERSHEDS PROJECT, and KETTLE RANGE CONSERVATION GROUP, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. FOREST SERVICE, GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service, RODNEY SMOLDON, Forest Supervisor, Colville National Forest, <br><br> Defendants. | Case No. 2:20-cv-00324 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act |

COMPLAINT – 1

# I.    INTRODUCTION

1.    Plaintiffs challenge the final record of decision adopting the U.S. Forest Service's 2019 Colville National Forest Land Management Plan ("the 2019 Plan"), and the subsequent grazing authorizations, for allowing excessive cattle grazing in the Colville National Forest ("Colville Forest" or "Forest"), leading to long-term damage to the forest ecosystem.

2.    The 1.1 million-acre Colville Forest is part of the northern Rocky Mountains, with the Kettle River Range on the west and the Selkirk Mountains on the east. It is largely comprised of densely forested, rugged terrain, including old-growth forests and peaks rising to 7,000 feet, with diverse meadow and riparian habitats. The Forest provides habitat for a wide variety of fish and wildlife, including species listed at the federal and state level. It also supports many forms of recreation, as well as extractive uses such as timber harvest and livestock grazing.



*A view of the Forest from Copper Butte in the Lambert grazing allotment, looking south toward Sherman Pass. (Photo courtesy of Kettle Range Conservation Group.)*

3.      In 2019, the Forest Service revised its land management plan for the Colville Forest for the first time in more than three decades. Prior to this planning process, cattle grazing allotments covered 66% of the Forest. However, in the course of updating its plan, the Forest Service conducted an analysis that revealed that only 26% of the Forest is suitable for cattle grazing. At the same time, the Forest Service acknowledged that historic overgrazing has "degraded range conditions" and has had "negative effects on some important unique habitats such as riparian areas and meadows."

4.      Despite this information, the Forest Service made no adjustments to grazing policies at either the plan or the allotment management level to prevent overgrazing from continuing to damage the Forest.

5.      Indeed, in the Environmental Impact Statement ("EIS") supporting the 2019 Plan, the Forest Service did not many forms of recreation consider any adjustment to the "number of livestock, the intensity of grazing, or the amount of area grazed." The 2019 Plan thus continues to allow the same number of cattle to graze at the same level of intensity and on the same grazing allotments, even though the Forest Service has determined that nearly 70% of the land in these allotments is

not capable or suitable for cattle grazing.[1] This includes continuing to allow cattle to graze throughout five allotments where less than 6% of the land is capable and suitable for cattle grazing, and throughout 28 allotments where less than 25% of the land was deemed capable and suitable.

6.    The Forest Service failed to meet the statutory and regulatory requirements for the 2019 Plan, including by failing to: (1) adjust the intensity of grazing, the number of livestock grazed, and/or the areas in which grazing is allowed in accordance with its capability and suitability analysis; (2) properly evaluate the suitability and capability of the Forest to sustain grazing; (3) adequately identify those lands it deemed not capable and not suitable for grazing; (4) take the required "hard look" at the impacts of overgrazing on valuable habitats, sensitive riparian areas, vulnerable wildlife populations, and recreational uses; and (5) consider a reasonable range of grazing management alternatives.

7.    The 2019 Plan provides that additional changes to grazing practices may be made for specific grazing allotments. However, on information and belief,

---

[1] Analysis of data obtained from the Forest Service through a public disclosure request shows 727,726 acres of Forest in cattle grazing allotments. Of these acres, the Forest Service determined 225,745 are suitable for cattle grazing, or about 31%. The other acreage deemed suitable for cattle grazing is not in current allotments.

COMPLAINT – 4

no such changes were made in advance of the 2020 grazing season. The Forest Service thus failed in its responsibility to revise management of these grazing allotments "as soon as practicable" to accommodate the new information from its suitability and capability analysis.

8.     The Forest Service's continued allowance of overgrazing has caused, and will continue to cause, significant ecological damage to the Forest, leading to the degradation of sensitive areas such as meadows and riparian areas, the destruction of valuable habitat for fish and wildlife, the killing of wildlife as a result of conflicts between wildlife and cattle, and a decrease in the value of the Forest for recreational uses.

9.     The Forest Service's failure to properly analyze and regulate grazing in the Forest violates the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the regulations implementing those statutes. Accordingly, Plaintiffs challenge the 2019 Plan, the final Record of Decision ("ROD") approving the Plan, and the Forest Service's subsequent Colville grazing authorizations. Plaintiffs seek remand of the 2019 Plan, and an injunction to restrict grazing activities in the Colville Forest to prevent continued harm to the ecosystem until the Forest Service complies with these governing laws.

## II.   JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), 2412 (costs and fees) and 1346 (United States as a defendant). This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701-706, NEPA, 42 U.S.C. §§ 4321-4370m-12, NFMA, 16 U.S.C. §§ 1600-1614, and those statutes' implementing regulations.

11.    The actions challenged are final agency actions, or actions unlawfully withheld or unreasonably delayed, properly subject to judicial review under the APA. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

12.    Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

13.    The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## III.   PARTIES

14.    Plaintiff THE LANDS COUNCIL is a Washington nonprofit organization dedicated to protecting and conserving the natural resources and quality of life of the Inland Pacific Northwest. With approximately 3,000 supporters,

including 1,200 members, The Lands Council's principal office is in Spokane, Washington. As an organization and on behalf of its staff and members, The Lands Council has been extensively involved in seeking to promote sound land management practices in the Colville Forest for over 35 years.

15.    Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a nonprofit membership organization with over 12,000 members and supporters, which is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP, as an organization and on behalf of its members, is concerned with, and active in, seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West and in Washington. WWP has a longstanding interest in the management of livestock grazing in the Colville Forest, and in ensuring that any such grazing is ecologically sustainable and achieves peaceful coexistence with all species of native wildlife.

16.    Plaintiff KETTLE RANGE CONSERVATION GROUP ("KRCG") is a rural, grassroots, non-profit environmental charity formed in 1976 in Republic, Washington, with a membership of 500. KRCG's mission is to defend wilderness, protect biodiversity, and restore ecosystems of the upper Columbia River Basin. KRCG's project work includes oversight of federal management of the Okanogan and Colville National Forests, promotion of dry and damaged forest restoration,

environmental education to citizens, business and community groups, preservation of wilderness, and protection of fish and wildlife. KRCG is a founding member of the board of Northeast Washington Forest Coalition, a collaborative created in 2003 between timber industry, forest and wildlife conservation, and recreation interests.

17.    Plaintiffs bring this action on their own behalf and on behalf of their members and supporters, many of whom live near the Colville Forest, or visit it for recreational and professional pursuits. Plaintiffs' members, supporters, and staff gain aesthetic enjoyment from using and enjoying the Colville Forest for recreation, including hiking, skiing, camping, backpacking, boating, fishing, and wildlife viewing. Plaintiffs' members, supporters, and staff have engaged in these activities in the past and intend to do so again in the near future. They gain aesthetic enjoyment from the beauty of the natural forest, including the meadows and riparian areas that are damaged by livestock grazing, as well as from observing, attempting to observe, hearing, seeing evidence of, and studying many species of fish and wildlife that live in the Forest. The opportunity to enjoy the beauty of the natural forest and its wildlife is of significant interest and value to Plaintiffs' members, supporters, and staff, and they are dedicated to ensuring the long-term health of the Forest and its wildlife. The legal violations alleged in this Complaint therefore cause direct injury to the aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests of Plaintiffs and their members, supporters, and staff.

18.     Plaintiffs participated in the comment and objection phases of the development of the 2019 Plan on behalf of their members, supporters, and staff, who have an interest in ensuring that the Forest Service complies with all applicable federal statutes and regulations authorizing domestic livestock grazing on federal forest lands. Plaintiffs' members, supporters, and staff have an interest in ensuring that the Forest Service fulfills its obligation to manage the Colville Forest in a manner that does not impair the diversity and viability of native wildlife that live there, or impair other uses or ecological values of the Forest. The interests of Plaintiffs, their members, supporters, and staff have been, and are being, adversely and irreparably injured by Defendants' failure to comply with federal law, and this injury will continue until and unless the relief requested in this Complaint is granted. These are actual, concrete injuries, traceable to Defendants' conduct, that would be redressed by the requested relief.

19.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States within the Department of Agriculture and is charged with managing the public lands and wildlife of the Colville National Forest, in accordance and compliance with NEPA, NFMA, the APA, and their implementing regulations.

20.     Defendant GLENN CASAMASSA is the Pacific Northwest Regional Forester for the U.S. Forest Service. He is sued solely in his official capacity as the decisionmaker who signed the final Record of Decision for the 2019 Plan.

21.    Defendant RODNEY SMOLDON is the Forest Supervisor for the Colville Forest, responsible for the management of the Colville Forest and its compliance with NEPA, NFMA and ESA requirements. Defendant Smoldon is sued solely in his official capacity.

22.    Defendants are collectively referred to as the "Forest Service."

## IV.    LEGAL BACKGROUND

### A. National Forest Management Act

23.    NFMA is the primary statute governing the administration of national forests. 16 U.S.C. §§ 1600-1614. NFMA and its implementing regulations provide for forest planning and management by the Forest Service on both the forest level and the individual project level.

24.    At the forest level, NFMA requires the Forest Service to develop, maintain, and revise a Land and Resource Management Plan ("Forest Plan") for each national forest. 16 U.S.C. § 1604(a). Forest Plans consist "of broad, long-term plans and objectives for the entire forest," *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018), and are "designed to manage forest resources by balancing the consideration of environmental and economic factors," *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

25.    A Forest Plan must establish natural resource management practices forest-wide, and provide for sustained yields and multiple uses, including the

coordination of outdoor recreation, livestock grazing, timber harvest, and soil conservation, as well as the protection of watersheds, riparian areas, wilderness, and fish and wildlife species habitat and diversity. 16 U.S.C. § 1604(e), (g). The Forest Service must provide for and foster public participation in the development, review, and revision of Forest Plans. *Id.* § 1604(d).

26.    NFMA requires the Forest Service to adopt regulations specifying guidelines for Forest Plans. *Id.* § 1604(g)(3); *see* 36 C.F.R. Part 219. The guidelines must ensure that Forest Plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives[.]" 16 U.S.C. § 1604(g)(3)(B).

27.    The Forest Service adopted forest planning regulations in 1982. 47 Fed. Reg. 43,037-43,052 (Sept. 30, 1982) ("1982 Rules").[2] The Forest Service revised the regulations in 2012, but with transitional provisions allowing the Forest Service to elect to apply the 1982 Rules to the development or revision of Forest Plans initiated

---

[2] Also available at https://www.fs.fed.us/emc/nfma/includes/nfmareg.html. In this Complaint, citations to the 1982 Rules will be in the form "1982 Rules § 219.xx."

prior to 2012. 36 C.F.R. § 219.17(b)(3). The Forest Service elected to apply the 1982 Rules to the development of the 2019 Plan.[3]

28.    The 1982 Rules require the Forest Service to obtain, and keep current, appropriate data for planning and managing the resources it manages. 1982 Rules § 219.12(d).

29.    The 1982 Rules require the Forest Service to make a determination during the planning process regarding the capability of national forest lands of sustaining domestic livestock grazing, and their suitability for that purpose, and to determine the condition and trend of the lands used for grazing. 1982 Rules § 219.20.

30.    Capability refers to the potential of an area of land to produce particular resources, such as forage to support the needs of both native wildlife and domestic livestock, which in turn depends on the physical components of the area such as climate, slope, landform, soils, and geology, as well as the application of management practices. *Id.* § 219.3. Suitability, on the other hand, is the appropriateness of applying certain management practices to a particular portion of

---

[3] The transition regulation allows the Forest Service to adopt the 1982 Rules for a particular plan, but still elect to apply the limited portion of the new 2012 regulations pertaining to the objection process. 36 C.F.R. § 219.17(b)(3).

the forest, "as determined by an analysis of the economic and environmental consequences and the alternative uses forgone." *Id.*

31.     The Forest Service must substantively implement the results of its capability and suitability analyses in each Forest Plan. In each Forest Plan, the Forest Service must "provide for diversity of plant and animal communities *based on the suitability and capability* of the specific land area in order to meet overall multiple-use objectives[.]" 16 U.S.C. § 1604(g)(3)(B) (emphasis added). Each Forest Plan must also "determine forest management systems … and procedures in light of … the availability of lands and their *suitability* for resource management." 16 U.S.C. § 1604(e)(2) (emphasis added).

32.     In developing Forest Plans that involve grazing, the Forest Service must present and consider a range of grazing alternatives. The 1982 Rules provide that:

> Alternative range management prescriptions shall consider grazing systems and the facilities necessary to implement them; land treatment and vegetation manipulation practices; and evaluation of pest problems; possible conflict or beneficial interactions among livestock, wild free-roaming horses and burros and wild animal populations, and methods of regulating these; direction for rehabilitation of ranges in unsatisfactory condition; and comparative cost efficiency of the prescriptions.

1982 Rules § 219.20(b).

33.     The Forest Service's guidance recognizes that suitability is an "alternative specific" determination, such that different alternatives considered in the planning process will involve different acreage and different specific lands being

COMPLAINT – 13

deemed suitable for grazing. *See* U.S. Forest Service, Rangeland Suitability for Livestock Grazing at the Forest Plan Level and Standards for NEPA Display (rev. March 2003), at 8. Changes to suitability determinations "involve making changes at the Forest Plan level, as suitability is a Forest Planning level determination." *Id.*

34.    Through the planning process, the Forest Service must develop alternatives that reflect a full range of commodity (e.g. livestock) and environmental resource uses, and the value produced by these alternatives, including the evaluation of uses that cannot be assigned a monetary value. *See* 1982 Rules § 219.12(f). This range of alternatives must be adequate to compare various combinations of outputs and uses, including commodity production, ecological values, and recreational values, in order to identify an alternative that maximizes the monetary and non-monetary social and economic values produced by the forest. *See* 1982 Rules §§ 219.1(a), .4(a)(1), .12 and .27.

35.    After a Forest Plan is approved, the Forest Service must implement the Forest Plan through site-specific actions. NFMA requires that "permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i); *see* 1982 Rules § 219.10(e). A project or activity is consistent if it conforms to the applicable components of the Forest Plan, including its goals, objectives, standards, guidelines,

desired conditions, and monitoring requirements. 36 C.F.R. § 219.15; Forest Service Handbook ("FSH") 2209.13 § 91.1.

36.    When Forest Plans are revised, NFMA requires that "resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans." 16 U.S.C. § 1604(i); *see* 1982 Rules § 219.10(e) ("As soon as practicable after approval of the plan," the Forest Service shall ensure that "all outstanding and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the plan."). The Forest Service's failure to comply with the provisions of a Forest Plan through its site-specific actions is a violation of NFMA.

**B. Federal Land Policy and Management Act**

37.    The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, governs the management of federal lands generally, and includes specific provisions regarding the management of domestic livestock range lands, *id.* §§ 1751-1753. The implementing regulations regarding range management are at 36 C.F.R. Part 222.

38.    The Forest Service allows livestock grazing on specified "allotments" within national forests. 43 U.S.C. § 1752; 36 C.F.R. § 222.1(b). The Forest Service manages livestock grazing on an allotment through an Allotment Management Plan

("AMP"), grazing permits issued in accordance with the AMP, and annual operating instructions ("AOIs") that guide grazing on a year-to-year basis.

39.    The Forest Service prepares an AMP for each allotment, which must specify a "program of action" to meet the "multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands involved." 36 C.F.R. §§ 222.1(b)(2), 222.2(b); 43 U.S.C. § 1702(k)(1). In contrast to a Forest Plan, which is an "overarching land management directive for an entire forest-wide unit," an AMP is a "land management directive for a specific allotment within a national forest that the Forest Service has designated for livestock grazing." *See Or. Nat. Desert Ass'n v. United States Forest Serv*., 465 F.3d 977, 980 (9th Cir. 2006). Each AMP must be consistent with the applicable Forest Plan, and when a plan is revised, "shall be revised as soon as practicable to be made consistent with such plans." *Id.*; 16 U.S.C. § 1604(i); 36 C.F.R.§ 222.2(c).

40.    A permit grants a specific license to graze on an allotment, and establishes: (1) the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the period of use. *Or. Nat. Desert Ass'n*, 465 F.3d at 980; 36 C.F.R. §§ 222.1, 222.3; 43 U.S.C. § 1752. The Forest Service generally issues grazing permits for ten-year periods. 36 C.F.R. § 222.3(c)(1). The terms and conditions of a grazing permit must be consistent with the AMP; they may be canceled if the land under permit is to be devoted to another public purpose, and may

be modified to comply with the provisions of an AMP or other management needs. 36 C.F.R. § 222.4(a).

41.     The Forest Service also issues yearly instructions to holders of national forest grazing permits through annual operating instruction ("AOIs"). FSH § 94.3. AOIs are used to respond to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit. *Or. Nat. Desert Ass'n*, 465 F.3d at 980–81.

**C. National Environmental Policy Act**

42.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA requires agencies to take a "hard look" at the consequences of prospective actions by ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To that end, NEPA requires federal agencies to prepare a detailed EIS for all major federal actions that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(C). An EIS must consider a "full spectrum" of reasonable alternative actions. *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, 46 Fed. Reg. 18,026 (March 23, 1981) (as amended in 1986); *see* 40 C.F.R § 1502.14.

43.    NEPA also requires that the public have access to the EIS, to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. 332, 349; *see also* 40 C.F.R. §§ 1500.1(b) and 1506.6(d).

44.    Under NEPA, agencies must "consider every significant aspect of the environmental impact of a proposed action" in an EIS. *Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010). This includes studying the direct, indirect, and cumulative impacts of an action. 40 C.F.R. §§ 1508.7, 1508.8.

45.    The Forest Service uses the NEPA process for the development of its Forest Plans, as well as for the development of most site-specific plans, including AMPs.

**D. Administrative Procedure Act**

46.    Agency actions taken pursuant to NMFA and NEPA are reviewable by this Court under the APA, 5 U.S.C. §§ 702, 704, 706. The APA provides that "[t]he Court shall … hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). *See Akiak Native Cmty. v. EPA*, 625 F.3d 1162, 1165 (9th Cir. 2010); *Am. Mining Cong. v. EPA*, 965 F.2d 759, 763 (9th Cir. 1992).

47.    While "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency … the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A rule is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

48.    The APA also provides that "[t]he reviewing court shall … compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). When determining if an agency unlawfully withheld or unreasonably delayed action, a court considers a "rule of reason" to determine the agency's time to act, the statutory scheme giving context to this rule of reason, whether the regulation concerns economics or human health, the priorities of agency, and any prejudice caused by delay. *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507-11 (9th Cir. 1997); *see also Telecomms. Research & Action Ctr. v. FCC,* 750 F.2d 70, 79-80 (D.C. Cir.

1984) (describing a six-part test for a mandatory injunction based on an APA

unreasonable delay claim).

## V.    FACTS

### A. The Colville National Forest

49.    The territory of the Colville Forest was shaped over 10,000 years ago

by Ice Age glaciers that carved three major valleys of today's Columbia, San Poil-

Curlew, and Pend Oreille rivers, the latter two of which flow north into Canada

before entering the Columbia River. The Forest was designated as a national forest

reserve in 1907.

50.    The current Colville Forest spans 1.1 million acres in Ferry, Stevens,

and Pend Oreille Counties in northeast Washington. It is bordered to the north by

British Columbia, Canada, to the west by the Okanogan-Wenatchee National Forest,

to the east by the Idaho Panhandle National Forests, and to the south by a portion of

the Confederated Tribes of the Colville Reservation. It encompasses two major

mountain ranges, the Selkirk Range and the Kettle River Range, and includes the

Salmo-Priest Wilderness.

51.    The Forest is largely comprised of densely forested, rugged terrain,

including old-growth forests, and peaks rising to 7,000 feet. It includes elevational

habitat zones ranging from old growth cedar forest to sub-alpine peaks, interspersed

with dramatic cliffs and vibrant meadows. The Forest includes many sensitive

riparian habitats, including dozens of lakes, and countless rivers, creeks, streams, and springs.

52.    The Forest supports a wide range of recreational uses, including wildlife-watching, hiking, backpacking, camping, horseback riding, cross-country and downhill skiing, mountain biking, hunting, and fishing. The Forest has 486 miles of hiking trails, including approximately 300 miles of the Pacific Northwest National Scenic Trail. The Forest Service estimates that there are approximately 335,706 recreational visits to the Forest each year, which generate an estimated 195 jobs and $3,556,000 in annual labor income. *See* 2019 Final Environmental Impact Statement ("2019 FEIS") at 622.

53.    The Forest contains habitat for a wide variety of fish, wildlife, and plant species, including many species that are either listed or candidates for listing at the federal and/or state level as endangered and threatened, and species designated by the Forest Service as "sensitive," because their regional viability is a concern. These species include the federally threatened Canada lynx, grizzly bear, yellow-billed cuckoo, and bull trout; the wolverine and whitebark pine (which are candidates for federal listing), and gray wolves (a state endangered species and Forest Service Region 6 "sensitive species"). The Forest also contains a significant elk herd, and populations of bald eagles, bighorn sheep, moose, cougars, black bears, and bobcat. The Forest provides habitat connectivity for wildlife moving between the Cascade,

Rocky Mountain, and upper Columbia mountains sub-range, including the grizzly bear, wolverine, wolf, and Canada lynx.

**B. Grazing in the Colville National Forest**

54.    Despite inhospitable terrain and sparse forage, the Forest has long been heavily grazed. Relatively large numbers of sheep and cattle grazed the Colville during the 1920s through the 1940s, with cattle utilizing the lower elevations and sheep grazing the higher elevations, especially in the Kettle River Range. During the 1950s, most sheep grazing ceased on Forest allotments. The Forest now has only one allotment set aside for sheep grazing, the Graves Mountain allotment, and it is currently vacant.

55.    The Forest Service reports that livestock grazing in the Forest currently generates approximately 98 jobs and $1,524,000 in annual labor income, or about 40% of the value that the Forest Service estimates is brought to the local economy through Forest recreational uses. 2019 FEIS at 603.

56.    The Forest Service reports that grazing allotments cover about 745,000 acres of administered Forest lands in the Colville Forest, although analysis of raw Forest Service data obtained through public disclosure requests suggests that number is actually 787,927 acres. This acreage is divided into 58 grazing allotments, 42 of which are subject to active grazing permits, while 16 are currently vacant. 2019 FEIS at 652. Only one of those allotments, the Graves Mountain allotment occupying

60,201 acres of Forest, is set aside for sheep grazing, while the rest are designated for cattle.

57.     According to the Forest Service, only 38 of the 58 grazing allotments have ever had site-specific environmental analysis performed under NEPA. 2019 FEIS at 652. Of those, only 4 have undergone environmental review during the past 20 years, and 16 have not had their AMPs updated since the last Colville Forest Plan was approved in 1988.[4] Only 12 Colville allotments are on the NEPA schedule for environmental review within the next eight years—the Forest Service was supposed to complete NEPA analysis on an additional two in 2019, but failed to do so. *See* USDA-Forest Service, *National Allotment NEPA Schedule, 2017-2028*.

58.     Much of the Forest consists of dense conifer stands. All told, 57% of the designated grazing allotments have canopy coverage greater than 60%, providing "little to no forage," while another 25% of the allotment area has 40-60% canopy coverage, which would provide "some" forage. 2019 FEIS at 650. As a result, 82% of the area within grazing allotments offers, at best, only marginal forage for livestock grazing.

---

[4] *See* U.S. Forest Service, *Land & Resources Management*, COLVILLE NATIONAL FOREST,                https://www.fs.usda.gov/detailfull/colville/landmanagement/?cid=fseprd555741&width=full (listing current AMPs) (last visited Sept. 9, 2020).

59.     In the 2019 FEIS it developed to support the 2019 Plan, the Forest Service determined that only 281,999 acres of the land in the Forest (26%) is both capable of sustaining cattle grazing, and suitable for that use under any of the alternatives it considered. 2019 FEIS at 1325. Of the acreage that the Forest Service deemed suitable for cattle grazing, 225,745 acres are within current cattle grazing allotments. This means the Forest Service has deemed approximately 31% of the current 727, 726 acres set aside for cattle grazing as both capable of sustaining grazing and suitable for that purpose. On five cattle grazing allotments, less than 6% of the land is capable and suitable for cattle grazing, and on at least 28 allotments, less than 25% of the land is capable and suitable for cattle grazing.

60.     For example, the Silver Creek Grazing allotment contains 25,353 acres, 87% of which is in the Forest, but the Forest Service deemed only 849 acres (3.4%) of that allotment suitable for cattle grazing. The Silver Creek allotment operates under an AMP that was last updated in 1981, and which does not contain any NEPA analysis or examination of the effects of grazing on the ecosystem of the allotment. Similarly, the Churchill allotment consists of 17,032 acres, 90% of which is within the Forest, and the Forest Service has determined that only 2,523 acres (14.8%) is suitable for cattle grazing. Its AMP was last revised in 1985.



*Maps of the Silver Creek and Churchill grazing allotments, showing areas identified by the Forest Service as suitable for grazing.*

## C. Harm to the Forest by Overgrazing

61.    The continued overgrazing of the Colville Forest has dramatically altered native ecological communities, harming both upland and riparian habitat for a multitude of wildlife, fish, and plants by degrading vegetation, soils, and streams.

 

*These photographs from 2019 show a wetland springs in the Forest's Copper Mires allotment, before and after cattle trampled the area. (Photos courtesy of KRCG.)*



*A photograph taken in September 2020 shows an overgrazed meadow and trampled riparian area in the Forest's CC Mountain allotment. (Photo courtesy of KRCG.)*

COMPLAINT – 26



*A photograph taken in June 2020 shows damage caused by cattle to a former pristine meadow in the Forest's Copper Mires allotment. (Photo courtesy of WWP.)*

62.     Because a large percentage of areas within grazing allotments do not produce enough forage for grazing, cattle amass in the few areas with sufficient forage, resulting in overgrazing in those areas, and significant damage to sensitive meadow and riparian habitats.

63.     Livestock grazing has caused significant degradation of fish habitats, riparian areas, and water quality and quantity. It has widened stream channels, reduced stream shade, destroyed overhanging banks, elevated erosion and consequently increased sedimentation, compacted soils, and exacerbated seasonal water temperature extremes in streams.

64.    Continued overgrazing under the 2019 Plan will continue to damage riparian areas and prevent their recovery. Merely applying riparian forage utilization standards is an ineffective approach to restoring and protecting areas degraded by livestock, because livestock damage habitat from trampling and chiseling banks and vegetation, as well as browsing and grazing. In order to protect these areas and allow them to rejuvenate, it is critical to reduce livestock access to them.

65.    Overgrazing also increases the risk of serious fires, by destroying the herbaceous understory and consuming grasses that would otherwise regulate the development of new tree seedlings, thus transforming healthy forests into dense stands of fire-sensitive and disease-susceptible species.

66.    Continued overgrazing will result in the continued spread of noxious weeds, both by the cattle themselves and by the increased vehicle traffic to care for the cattle.

67.    Upland range areas are the last used and often most impacted by livestock grazing, which occurs in these areas from mid-August through October, during a time of great weather fluctuation. This results in tremendous displacement of soil, loss of the shrub layer, damage to trails, and destruction of sub-alpine meadows.

68.    Grazing is also a source of conflicts with native predators, including wolves, bears, cougars, and coyotes. Livestock stranded in densely forested terrain

with little forage often become lost, injured, and trapped in downed trees, and it is impossible for them to bunch together in large groups for protection. As a result, they are easy prey for native predators. In response, state and private entities kill large numbers of native predators, including wolves, bears, and cougars, within Colville Forest in a futile attempt to defend non-native livestock allowed to graze on unsuitable and indefensible terrain.

69.    Grazing allotments overlap with recreational trails used by hikers, backpackers, mountain bikers, and motorized recreationists. Summer hikers on the Pacific Northwest Trail encounter livestock, feces, dust-choke from cattle churn on trails, contaminated water, and confusing braided trails. In particular, overgrazing in the Kettle Crest region is resulting in the serious degradation of valued recreational resources, including a spectacular stretch of the Pacific Northwest Trail running along the Kettle Crest. Hikers accustomed to high quality air, water, and trails do not return after they encounter these conditions, resulting in a loss to the local economy.

**D. The Colville's Forest Plan Revision**

70.    The Forest Plan was last updated in 1988 and was due to be revised by 2003 at the latest. In 2004, the Forest Service began the public scoping process for revising the Plan. More than a decade later, in January 2016, the Forest Service released a draft programmatic EIS ("DEIS") and a draft revised Forest Plan ("Draft

Plan"). The DEIS evaluated six alternatives, all of which contained essentially identical grazing provisions.

71.    Plaintiff Kettle Range Conservation Group submitted detailed comments on the draft DEIS and the Draft Plan, raising concerns about the ecological effects of grazing on riparian, hydrologic, and aquatic functions within the Forest and beyond.

72.    In September 2018, the Forest Service released a revised EIS ("2018 EIS"), a revised Forest Plan ("2018 Plan"), and a draft Record of Decision ("Draft ROD") for the revised Forest Plan.

73.    Pursuant to the Forest Service's administrative review process (also referred to as the "objection" process, described in 36 CFR 219 Subpart B of the 2012 NFMA planning rule), all Plaintiffs filed objections to the 2018 EIS, the Draft ROD, and the 2018 Plan. Those comments raised a wide range of issues pertaining to livestock grazing in the Forest, and the Forest Service's analysis and regulation of grazing in the 2018 Plan, including the issues raised in this Complaint.

74.    Following objection meetings in April 2019, the Forest Service issued a final ROD approving and adopting the 2019 Plan and the 2019 FEIS (collectively, "Final Plan Documents"). The ROD is a final agency action subject to judicial review. It is intended to be the governing Forest Plan for the next 15 years—but, if history is any indicator, it may be in effect for much longer.

75.     The draft and final versions of the EIS generally describe the process for analyzing the capability and suitability of the land in the Colville Forest for grazing. *See* 2019 FEIS App. G, Part VI. But the Plan documents do not disclose the data or analysis that the Forest Service used to determine which lands are capable and suitable for grazing, or specifically identify the lands determined to be capable and suitable. The 2019 FEIS includes four small maps displaying the results of the capability and suitability analyses, but the maps lack adequate detail or resolution to meaningfully identify to the public which lands the Forest Service deemed capable and suitable for grazing, to allow any analysis of the results of that analysis by allotment, or to compare in any meaningful detail the differences in the lands deemed capable or suitable in the various drafts of the EIS and Forest Plan. *See* 2019 FEIS at 1328-30.

76.     The Final Plan Documents reveal the Forest Service's determination that 628,740 acres within the Forest are capable of supporting cattle grazing. 2019 FEIS at 1325. The Forest Service only deemed 281,999 of these acres as suitable for cattle grazing under all the action alternatives.[5] 2019 FEIS at 1325.

---

[5] Only the "no action" alternative contained a different suitability number. It identified 284,082 acres as suitable for cattle grazing. Each of the alternatives eliminated some of that acreage due to the addition of wilderness areas.

77.    Under the Forest Service's analysis, this means that although cattle grazing is allowed in 66% of the Forest (about 727,726 acres), less than 26% of the Forest (281,999 acres), is both capable of sustaining cattle grazing and suitable for that use. Of the acreage the Forest Service deemed suitable for cattle grazing, 225,745 acres are within current cattle grazing allotments—consisting of about 31% of those allotments.

78.    Even this is an overestimate. Among other flaws in its analysis, the Forest Service considered land with between 60% and 70% tree cover as capable and suitable for livestock grazing, even though it concedes that land with canopy cover greater than 60% would "likely provide little to no forage." *See* 2019 FEIS at 650, 1325.

79.    Although grazing suitability is supposed to involve an "analysis of the "economic and environmental consequences" of using certain land for grazing, and an evaluation of the "alternative uses forgone," 1982 Rules § 219.3, no such analysis took place in the Final Plan Documents. Rather, the amount of land deemed suitable for grazing is identical under all action alternatives considered in the 2019 FEIS, and the suitability analysis includes no evaluation of the alternative uses forgone, or the economic and environmental consequences of the suitability determination. 2019 FEIS at 1328.

80.    The Forest Service made no adjustments to grazing in the Colville Forest in light of its conclusions as to capability and suitability. The 2019 Plan does not change the "number of livestock, the intensity of grazing, or the amount of area grazed." 2019 FES at 539 (describing the alternative selected in the 2019 Plan). It also includes no adjustments to "the status, location, or boundaries of permitted range allotments or type of livestock." 2019 FEIS at 438. The 2019 Plan thus continues to allow the same number of cattle to graze at the same level of intensity and on the same grazing allotments, despite its determination that nearly 70% of the land in these allotments is not capable or suitable for cattle grazing, with some allotments having less than 3% of their land suitable for cattle grazing.

81.    The Final Plan Documents contain no rationale to support the Forest Service's decision to continue to allow widespread grazing on land that it deemed to be not capable or not suitable for supporting grazing. Instead, the 2019 FEIS disclaims that the capability and suitability analysis is designed to serve any particular purpose, emphasizing that it was "not a decision to graze livestock on any specific area of land," was not a "decision about, or estimate of, livestock grazing capacity," and that it "may or may not provide supporting information for a decision to graze livestock on a specific area." 2019 FEIS at 1323.

82.    The 2019 FEIS acknowledges that historic overgrazing has "degraded range conditions," that it has had "negative effects on some important unique

habitats such as riparian areas and meadows," and that "many riparian habitats are in poor condition due to the effects of past and current grazing." 2019 FEIS at 483, 496.

83.    The 2019 FEIS does not, however, analyze the effect of allowing continued overgrazing, including grazing in areas that were not capable of supporting grazing or not suitable for that purpose. The 2019 FEIS does not examine the effects (direct, indirect, or cumulative) of the Forest Service's decision to continue to allow grazing on land that was not deemed capable or suitable on conflicts between livestock and wildlife, or on the health of the Forest ecosystem, including fish and wildlife habitat, riparian areas, soil and water resources, erosion, and the diversity of plant and animal communities.

84.    For the lands in the grazing allotments, the Forest Service did not estimate the present and potential supply of forage for livestock, or the capability of those lands to provide suitable food and cover for wildlife species.

85.    In addressing the condition and trend of the land in the allotments designated for grazing, the Forest Service relies on data that it characterized as "limited." 2019 FEIS at 651. The Forest Service concedes it lacks "[k]nowledge and synthesis of current monitoring data for annual livestock use indicators, such as stubble height, bank alteration within the active floodplain and woody species utilization." *Id.* at 657.

86.    The long-term analysis completed by the Forest Service relies upon data last evaluated in 2005—more than 15 years ago—based on plots that were "relocated" between the time they were established approximately 60 years ago, and the time they were "inventoried" in 2002 and 2005. 2019 FEIS at 651. Of the 15 long-term sites monitored, the 2019 FEIS indicates forage conditions were "fair" for four and "poor" for four, and that the trend after 30 to 50 years was up for two sites, down for four sites, and static for the remainder. *Id.* The Forest Service provides no support for its conclusion that "the majority of long-term monitoring sites show an improvement in condition and trend." *Id.*

87.    Although the 2019 FEIS claims that "[e]cological conditions and trends in forage areas have been evaluated annually (utilization and actual use) and extensively (long-term monitoring sites) during the allotment NEPA process for each allotment," it provides no data from any such annual evaluations, and concedes that 20 of the allotments have *never* undergone NEPA analysis. 2019 FEIS at 651-52.

88.    The Final Plan Documents do not incorporate or discuss the grazing suitability and capability analysis, or the Forest Service's conclusions as to which lands are capable and suitable, into any other part of the Plan or the analysis of the impact of grazing on wildlife, habitats, ecosystem health, or other uses, including recreation.

89.    The alternatives evaluated in the 2019 FEIS do not include the comparison of potential suitability determinations, as the amount of land deemed suitable is the same across all alternatives. The 2019 FEIS also does not evaluate any alternatives (a) exploring different levels of grazing intensity or different options for areas on which grazing would be allowed, (b) analyzing the effect of various grazing alternatives on competing management objectives such as recreational and ecological values, or (c) evaluating and comparing the effect of various alternatives on the overall monetary and non-monetary social and economic value produced by the Forest.

90.    By the Forest Service's own characterization, "projections of cattle grazing are the same across all alternatives." 2019 FEIS at 603. None of the alternatives in the 2019 FEIS consider any reduction in the total number of livestock allowed onto Forest allotments, changes to the time frame during which livestock are allowed to graze, adjustments to any allotment boundaries, the closure of any allotments to grazing, or the imposition of any areal restrictions within allotments. The 2019 FEIS did not analyze a "no grazing" alternative.

91.    The Final Plan Documents do not contain a cost-benefit analysis of grazing in the Forest. In particular, none of the documents analyze the direct monetary expense of grazing to the Forest, or the costs of grazing in terms of its

adverse effects on other uses and values in the Forest, and adverse effects on biological diversity.

92.    The only attempt in the 2019 Plan to address the harms of overgrazing are in the form of "standards" and "guidelines" to be incorporated into allotment-level plans. The standards include vague requirements, such as that livestock grazing should be managed to "move toward aquatic and riparian desired conditions," with the possibility of modifications or removal of livestock if those conditions are not met. *See* MA-STD-RMA-08 (2019 Plan at 122).

93.    However, most of the regulation of grazing in the 2019 Plan is through "guidelines" to be *considered* in site-specific actions. These guidelines include some criteria that might be used to mitigate the harm of overgrazing to some areas, such as minimum stubble heights, percentages of vegetation that may be used, and restrictions on streambank alteration. *See, e.g.*, Plan at 126 (MA-GDL-RMA-12, Annual Grazing Use Indicators). However, the Forest Service rejected alternatives that would have imposed more of these guidelines as "standards," which would have imposed enforceable restraints at the allotment level.

**E. Implementation of the Revised Forest Plan**

94.    The Final Plan Documents do not impose, or require the Forest Service to impose, any meaningful restrictions on grazing activity.

95.     The ROD emphasizes that the Plan only "designates management areas as suitable or not suitable for grazing." 2019 ROD at 15. The Plan took no action based on these designations, and the ROD states that "[a]ll other grazing decisions will continue to be made at the allotment level." *Id.* Far from indicating that these allotment-level decisions should be used to constrain grazing consistent with the suitability and capability analysis, however, the ROD suggests that "[s]ite-specific analysis at the allotment scale has the potential to allow for an *increase* in grazing capacity" (emphasis added). *Id.* at 10.

96.     The Draft ROD provided that existing term grazing permits would be modified through AOIs to conform with Forest Plan direction in the operating season after the final ROD is signed. Draft ROD at 36-37. Similarly, the 2018 EIS provided that "grazing would continue to be managed through the annual operating instructions for each allotment." 2018 EIS at 1120; *see also* DEIS at 522 ("Annual operating instructions for livestock grazing permittees should ensure livestock numbers are balanced with capacity and address any relevant resource concerns (e.g., forage production, wildlife, weeds, soils, etc.).)"

97.     The final ROD, however, eliminates mention of making changes in AOIs, indicating instead that "permits for ongoing uses will continue under direction contained in the existing permits that are compliant with the 1988 plan until such

time as a project-level analysis is completed that incorporates revised land management plan direction." ROD at 53.

98.    In Appendix B to the 2019 Plan, the Forest Service indicates it will "[c]omplete environmental analysis and assess and update allotment management plans to improve allotment management and protect and manage the resources present within them." 2018 Plan at 183. None of the Final Plan Documents, however, includes any plans to update the environmental analysis for the allotments or any schedule for doing so. The Forest Service's latest National Allotment NEPA Schedule for 2017 to 2028 indicates that only 14 the Forest's grazing allotments were scheduled to have NEPA review conducted during this time period—and two of those assessments were scheduled for 2019, but did not occur.

99.    The 2019 FEIS indicates that livestock grazing is to be managed under an "adaptive management" strategy, "to match livestock numbers with annual forage production and resource needs based upon assessment and monitoring data." 2019 FEIS at 656. However, on information and belief, the Forest Service has not taken any steps to acquire the assessment and monitoring data that would be necessary to implement such a strategy, nor has it developed any plan to do so.

100.   Not only did the ROD eliminate the commitment to making changes in grazing through the AOIs, but the Forest Service recently stopped issuing AOIs for permit holders in the Colville Forest. Instead, the Forest Service now issues annual

instructions by means of "AOI Meetings" with the holders of Colville Forest grazing permits. According to information gained through public disclosure requests, the AOI meetings for the 2020 grazing season took place between April and June 2020. Because the Forest Service has stopped issuing AOIs for the Colville Forest grazing allotments, the AOI Meetings are final agency actions subject to judicial review.

101. Upon information and belief, no changes were made during the 2020 AOI Meetings to account for the Forest Service's conclusion that nearly 70% of the land in current cattle grazing allotments is not capable or suitable for cattle grazing. No restrictions were placed to limit access of livestock to areas deemed not suitable or not capable, or to reduce the number of livestock grazing, the length of grazing, or the intensity of grazing to prevent additional harm from overgrazing. And no changes were made to implement any of the standards and guidelines contained in the 2019 Plan to control the harmful effects of overgrazing.

## I.    CLAIMS

**First Claim** –**The Forest Service Failed to Adjust Grazing Strategy in the 2019 Plan in Accordance with Its Capability and Suitability Analysis, in Violation of NFMA**

102. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

103.   NFMA and its implementing regulations require that the Forest Plan identify lands that are capable and suitable for livestock grazing. 1982 Rules § 219.20.

104.   NFMA requires that a forest plan "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives," 16 U.S.C. § 1604(g)(3)(B), and must "determine forest management systems … and procedures in light of … the availability of lands and their suitability for resource management," 16 U.S.C. § 1604(e)(2).

105.   NFMA and its implementing regulations require that a forest plan address a number of ecological considerations that would be affected by the allowance of grazing, the areas in which it is allowed, and the capability and suitability of the land to sustain grazing. These ecological considerations include the maintenance of plant and animal communities and their habitat and diversity in order to meet multiple use objectives, the management of fish and wildlife habitat, conflicts between livestock and wildlife, conservation of soil and water resources, minimization of erosion, or protection of riparian areas. *See* 16 U.S.C. § 1604(g)(3)(B), 1982 Rules §§ 219.19, .20, .26 and .27.

106.   In the Final Plan Documents, the Forest Service determined that only 31% of the land within current cattle grazing allotments is capable and suitable for

cattle grazing. Yet the Final Plan Documents do not make any adjustments based on these determinations. The 2019 Plan does not restrict grazing to the capable and suitable land, make any adjustments to the areas on which it will authorize grazing, or change the amount, intensity or duration of grazing. In fact, the Final Plan Documents state explicitly that the capability/suitability analysis should not even be taken to provide supporting information for a future decision to graze livestock (or not) in a particular area.

107.    The Final Plan Documents violated NFMA by failing to limit grazing in any way based on its analysis of grazing capability and suitability, and by deferring any changes in grazing requirements to be made at the allotment level with no guidance from the Plan and without applying the Plan's required capability and suitability analysis, eviscerating the 1982 Rules' requirement that the planning process include an analysis of capability and suitability of the forest lands for grazing.

108.    The Final Plan Documents are therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**Second Claim – The Forest Service Failed to Consider Necessary Factors in Determining the Capability and Suitability of Land for Grazing, in Violation of NFMA**

109.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

110.   NFMA and its implementing regulations require that in the planning process for the Forest, the Forest Service determine the suitability and capability of lands in the Forest for grazing. In determining capability, the Forest Service should evaluate the potential of an area of land to produce particular resources, such as forage to support the needs of both native wildlife and domestic livestock. 1982 Rules § 219.3. In determining suitability, it should analyze the appropriateness of applying certain management practices to a particular portion of the forest, "as determined by an analysis of the economic and environmental consequences and the alternative uses forgone." *Id.*

111.   The Forest Service acknowledged that land with 60% canopy cover provides little to no forage, but it failed to exclude these lands from the land it deemed to be capable of supporting grazing and suitable for that purpose.

112.   The amount of land deemed suitable for cattle grazing is identical across all action alternatives considered in the 2019 FEIS. The suitability analysis does not include any evaluation of alternative uses forgone by identifying any

COMPLAINT – 43

particular land as suitable for cattle grazing, or any analysis of the economic and environmental consequences of that determination. 2019 FEIS at 1328.

113.   NFMA and its implementing regulations require that in the forest planning process, the Forest Service identify the condition and trend of land identified as suitable for grazing, 1982 Rules § 219.20(a), and obtain adequate data to support the planning process, 1982 Rules § 219.12(d). The Forest Service lacked, and did not obtain, adequate data to perform the required condition and trend evaluation. The limited data possessed by the Forest Service indicated that the condition of the grazing plots was trending downward.

114.   NFMA and its implementing regulations require that in the forest planning process, for the lands the Forest Service identifies as suitable for grazing, the Forest Service estimate "the present and potential supply of forage for livestock," and "the capability of these lands to provide suitable food and cover for selected wildlife species." 1982 Rules § 219.20(a). The Forest Service failed to estimate the present and potential supply of forage for livestock or estimate the capability of lands grazed by livestock to provide suitable food and cover for wildlife species.

115.   NFMA and its implementing regulations require that the Forest Service estimate and compare the resource tradeoffs and opportunity costs associated with achieving alternative resource objectives. 1982 Rules § 219.12(g). The Forest Service failed to estimate the resource tradeoffs and opportunity costs, including

adverse impacts on other objectives and uses for the Forest, inherent in allowing cattle grazing throughout the 66% of the Forest located in cattle grazing allotments, and in particular on the large portion of that land that is not capable and suitable for grazing. Performing such an analysis is critical to a meaningful comparison of alternatives.

116.    The Forest Service failed to gather the required data to make determinations as to the capability and suitability of Forest allotments for supporting grazing, and failed to adequately consider the data that it had regarding the capability and suitability of these allotments for grazing. The Forest Service thus violated NFMA by failing to consider the required factors in making its determination of capability and suitability.

117.    The Final Plan Documents are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**Third Claim –The Forest Service Failed to Adequately Identify Suitable and Capable Grazing Land, in Violation of NFMA and NEPA**

118.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

119.    The NFMA regulations require that a Forest Plan identify lands suitable for grazing and capable of sustaining it. 1982 Rules § 219.20.

120.   NMFA also requires the Forest Service to "provide for public participation in the development, review, and revision of land management plans." 16 USC §1604(d)(1).

121.   Moreover, NEPA "guarantees that the relevant information will be made available to the larger audience." *Robertson*, 490 U.S. at 349. NEPA regulations provide that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 CFR §1500.1(b); *see also* 40 CFR §1506.6(a), (d).

122.   The 2019 FEIS describes generally the process for analyzing the capability and suitability of the land in the Colville Forest for grazing, but none of the Final Plan Documents disclose the data or analysis underlying the determination as to which lands are capable and suitable for grazing, or adequately identify the lands the Forest Service determined to be capable and suitable for grazing within the Final Plan Documents.

123.   The Forest Service thus violated both NFMA and NEPA by adopting the 2019 Plan without making available to the public the data or analysis underlying its determination as to capability and suitability, or meaningfully identifying the lands it deemed capable and suitable.

124.   The Final Plan Documents are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**<u>Fourth Claim</u> – The Forest Service Failed to Consider a Range of Grazing Alternatives, in Violation of NFMA and NEPA**

125.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

126.   NFMA regulations require the Forest Service, in developing the 2019 Plan, to present, analyze, and consider a range of grazing alternatives in order to identify their impacts on recreational and ecological uses and values of the forest, and to compare the overall monetary and non-monetary value produced by the forest under various alternatives. 1982 Rules §§ 219.12(f), 219.20(b), 219.27.

127.   NEPA requires that the FEIS include and consider all reasonable alternatives to the proposed action. 40 C.F.R. § 1502.14.

128.   The FEIS and the 2019 Plan did not present or evaluate a reasonable range of alternatives (a) evaluating different suitability determinations; (b) exploring different levels of grazing intensity or areas on which grazing would be allowed, including a "no grazing" alternative, (c) analyzing the effect of various alternatives on competing management objectives including recreational and ecological values,

or (d) evaluating and comparing the effect of various alternatives on the overall monetary and non-monetary social and economic value produced by the Forest.

129.    The Final Plan Documents are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**Fifth Claim – The Forest Service Failed to take the Required "Hard Look" at the Ecological Effects of Overgrazing, in Violation of NEPA**

130.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

131.    NEPA requires agencies to take a "hard look" at the consequences of prospective actions by "carefully consider[ing] detailed information concerning significant environmental impacts." *Robertson*, 490 U.S. at 349.

132.    NFMA requires that a forest plan "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives," 16 U.S.C. § 1604(g)(3)(B), and must "determine forest management systems … and procedures in light of … the availability of lands and their suitability for resource management," 16 U.S.C. § 1604(e)(2).

133.    NFMA and its implementing regulations require that a forest plan address a number of ecological considerations that would be affected by the

allowance of grazing, the areas in which it is allowed, and the capability and suitability of the land to sustain grazing. These considerations include the maintenance of plant and animal communities and their habitat and diversity in order to meet multiple use objectives, the management of fish and wildlife habitat, conflicts between livestock and wildlife, conservation of soil and water resources, minimization of erosion, or protection of riparian areas. *See* 16 U.S.C. § 1604(g)(3)(B), 1982 Rules §§ 219.19, .20, .26 and .27.

134.   The Final Plan Documents do not discuss or incorporate the Forest Service's grazing suitability and capability analysis, or its conclusions as to which lands are capable and suitable for grazing, into any other analysis or requirements of the Plan, including the discussion of the ecological considerations listed in the prior paragraphs, even though the suitability and capability of the Forest's lands for grazing has significant effects on each of those ecological considerations.

135.   The Final Plan Documents are therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**Sixth Claim - The Forest Service Failed to Revise Allotment-Level Grazing Authorizations to Limit, Condition, or Prohibit Grazing on Land not Capable and Suitable for Grazing, in Violation of NFMA**

136.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

137.    NFMA requires that "permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). It also requires that "[w]hen land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable." *Id.*

138.    In the September 2019 Forest Plan, the Forest Service determined that only about 31% of its current cattle grazing allotments are suitable for grazing. Yet the Forest Service did not make any changes to the existing AMPs, grazing permits, or to the grazing requirements imposed through the 2020 AOI Meetings, to account for this capability and suitability analysis, to prevent livestock from continuing to graze on areas that it had deemed not capable of supporting or suitable for grazing, or to prevent continued overgrazing from damaging the Forest. The Forest Service further failed to change the AMPs, grazing permits, or grazing requirements imposed through the AOI Meetings to apply the grazing guidelines and standards in the 2019 Plan.

139.   The 2020 AOI Meetings were agency actions that were arbitrary, capricious, an abuse of discretion, and not in accordance with law, pursuant to the APA, 5 U.S.C. § 706(2).

140.   The Forest Service's failure to change the conditions of its grazing authorizations in the Colville Forest to implement the 2019 Plan's findings, analysis, guidelines, standards, or requirements violate the NFMA and the 1982 Rule, and therefore constitute an agency action unlawfully withheld or unreasonably delayed, and therefore should be compelled by a mandatory injunction pursuant to the APA, 5 U.S.C. § 706(1).

## VI.    REQUEST FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

A.    Hold unlawful the Final Plan Documents, under the judicial review standards of the APA, 5 U.S.C. § 706(2), because their adoption was arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence in the record, and because they violate NEPA and NFMA, or both, and therefore are not in accordance with law;

B.    Remand the Final Plan Documents without vacatur, with instructions to revise them in accordance with the Forest Service's obligations under the APA, NEPA, and NFMA;

C.    Declare that the Forest Service's 2020 allotment-specific grazing authorizations are unlawful under the judicial review standards of the APA, 5 U.S.C. § 706(2), because they violated NFMA, and are arbitrary, capricious, an abuse of discretion, or contrary to law;

D.    Enjoin the Forest Service from continuing to authorize grazing on the Colville Forest allotments until such time as the Forest Plan, AMPs, grazing permits and/or AOI or AOI meetings have been brought into compliance with the APA, NEPA, and NFMA;

E.    Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as Plaintiffs may request;

F.    Retain jurisdiction over this case until the Forest Service complies with NEPA, NFMA, and the APA;

G.    Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

H.    Grant such further relief as the Court deems just and proper.

Respectfully submitted this 10th day of September, 2020.

ANIMAL & EARTH ADVOCATES, PLLC

By _____

Claire Loebs Davis

*Counsel for Plaintiffs*